921 So.2d 490 (2005)
Ronnie JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
Ronnie Johnson, Petitioner,
v.
State of Florida, Respondent.
Nos. SC03-382, SC03-1680.
Supreme Court of Florida.
March 31, 2005.
Rehearing Denied May 26, 2005.
*494 Charles G. White, Miami, FL, for Appellant/Petitioner.
Charles J. Crist, Jr., Attorney General, Tallahassee, Florida and Sandra S. Jaggard, Assistant Attorney General, Miami, FL, for Appellee/Respondent.
PER CURIAM.
Ronnie Johnson appeals an order of the circuit court denying his motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850 and petitions the Court for a writ of habeas corpus.[1] We affirm the circuit court's order denying Johnson's rule 3.850 motion, and we deny Johnson's petition for a writ of habeas corpus.

FACTUAL AND PROCEDURAL BACKGROUND
Johnson was convicted of the March 11, 1989, first-degree murder of Tequila Larkins. The jury recommended the death penalty by a vote of nine to three. The trial court followed the jury's recommendation and sentenced Johnson to death. *495 His conviction and sentence were affirmed by this Court on direct appeal. The relevant facts in this case are contained in this Court's opinion on direct appeal. See Johnson v. State, 696 So.2d 326, 327-29 (Fla.1997).
In a separate trial conducted after the Larkins trial, Johnson was convicted of the March 20, 1989, first-degree murder of Lee Arthur Lawrence. See Johnson v. State, 696 So.2d 317 (Fla.1997). The jury recommended the death penalty by a vote of seven to five, and Johnson was sentenced to death by the trial court. Johnson's conviction was affirmed by this Court on direct appeal.
Johnson filed a motion for postconviction relief regarding the Larkins case on March 1, 2001, and an amended motion on January 18, 2002. In the amended motion Johnson asserted nine ineffective assistance of counsel claims and eight other claims.[2] After a Huff[3] hearing, the circuit court ordered an evidentiary hearing on only one claim: whether counsel was ineffective for failing to investigate Johnson's mental health. The evidentiary hearing was held on October 4, 2002. Johnson presented the testimony of Dr. Merry Haber, a clinical and forensic psychologist, his mother, and himself. The State presented the testimony of Raymond Badini, Johnson's trial counsel.

Testimony of Defense Mental Health Expert
Dr. Haber testified that she reviewed the transcript of the penalty phase of Johnson's trial and his prison records, that she spoke to Johnson and his family, and that she reviewed a brief memo prepared by defense counsel that detailed the facts of the case. Dr. Haber's review of the *496 penalty phase testimony alerted her to a need to psychologically evaluate Johnson. She thought a psychological evaluation was needed for two reasons: (1) most of the witnesses from the penalty phase said that Johnson did not have a substance abuse problem, yet his brother, Lamont, and his stepfather, Mr. Ferguson, said he had an alcohol problem; (2) during his penalty phase testimony, Johnson refused to talk about his friend, Ant, who was killed. Dr. Haber was also interested in whether there had been domestic violence between Johnson's mother and stepfather. She found that there had been no domestic violence, but there had been conflict in the home, which was in part due to the stepfather's drinking. In addition, she felt that Johnson's account of his grandmother's death raised issues.
Dr. Haber met with Johnson on August 7 and 21, 2001. She also met with Johnson's mother and two younger stepbrothers. Dr. Haber administered the MMPI-2 and the Millon Clinical Multiaxial Inventory to Johnson. Based on her conversations with Johnson and his family and the results of her tests, Dr. Haber believed that Johnson was depressed and anxious, had behavioral problems, and had not resolved certain issues in his life.
Dr. Haber believed that one source of conflict in Johnson's life was that he knew that he was a homosexual by the time he was seven years old, but he attempted to hide this from his family. She testified that this caused him serious conflict because he was not comfortable with his homosexuality. It was Dr. Haber's understanding that Johnson used alcohol and drugs to have sex and that he prostituted himself for money.
Dr. Haber believed that the results of her 2001 evaluation were valid as to Johnson's psychological state at the time the murders occurred in 1989, although she could not say so with as much certainty as she could say that they were valid as to his state at the time of the evidentiary hearing. After comparing her conclusions with the DSM-III that was used in 1989, Dr. Haber believed that in 1989 Johnson had an adjustment disorder with mixed disturbance of emotion and conduct. She also believed Johnson had a sexual disorder in that he was not comfortable with his sexuality and had to hide it from people and suffered from a poly-substance dependence, a regular pattern of using alcohol, cocaine, and marijuana to self-medicate. She stated that these disorders resulted in Johnson's judgment being somewhat impaired at the time of the murders. She believed he was mentally confused and disturbed, felt guilty, and was depressed. In relation to these crimes, the alleged disorders led Johnson to act with reckless abandon and without regard for human life. She thought that Johnson needed to commit these crimes to "present an image to the world of being cool and tough," although she acknowledged he did commit the crimes in part for pecuniary gain.
Dr. Haber believed that at the time of the murders, Johnson was under the stress of the death of his grandmother and his friend Ant. Johnson never had a father or a healthy role model. Johnson felt guilty about the death of Ant because Ant had attempted to repair his friendship with Johnson two days before his death and Johnson had refused to speak to him. These stressors led Johnson to use illicit substances, which led to an impairment in his judgment.
Dr. Haber stated that Johnson "had a diagnosable disorder, not a major mental disorder by any stretch of the imagination, but a mental disorder which impaired his judgment, in addition to cocaine, alcohol and marijuana, and I believe he was in great conflict at the time."
*497 On cross-examination, Dr. Haber stated that Johnson was cooperative and appropriate in her interviews with him. She admitted that the sentencing transcript reflected that Johnson's mother was a loving person who cared dearly for him, that Johnson's stepbrother was a loving person, and that his stepbrother was a good person even though he was the natural child of an allegedly alcoholic father. Johnson told Dr. Haber that he began using drugs at the age of thirteen and that the first loss of a family member had occurred when Johnson was eleven.
Dr. Haber was aware that Johnson had a criminal history. Prison records that she reviewed disclosed six disciplinary reports and four stays in solitary confinement. She was not aware that in addition to the Larkins and Lawrence murders, Johnson was convicted of the attempted murder of Marshall King. She had not been provided with information about this crime and was not aware that Johnson had been hired by the same person to commit the attempted murder of King and the Larkins and Lawrence murders. She did not review any police reports concerning the murders, did not read Johnson's confession, and was unaware that Johnson had been paid $700 for the attempted murder of King, $700 for the murder of Larkins, and was to split $1500 with two codefendants for the murder of Lawrence. She admitted that all she knew about the crimes came from brief summaries provided by defense counsel.
Dr. Haber acknowledged that she relied upon the report of Dr. Ansley, a neuropsychologist who evaluated Johnson at the request of defense counsel. Dr. Ansley's report found Johnson to be of average intelligence, with no neuropsychological damage, and no organic brain damage.
Dr. Haber agreed that Johnson did not reveal his homosexuality to his family until 1995, after he had been on death row for three years. She admitted that in some communities and at certain ages, homosexuals are uncomfortable. To Dr. Haber's knowledge, there was no correlation between being a homosexual and being a hired hit man.
Dr. Haber acknowledged that adjustment disorders begin within three months of a stressor and last no more than six months thereafter unless the stressor continues. She agreed that Johnson had adjusted to the death of his cousin when he was eleven. However, she did not believe that Johnson had adjusted as well to later deaths, especially the death of Ant. Dr. Haber also agreed that the DSM-III stated that a person should not be diagnosed with adjustment disorder if they were just grieving.
Dr. Haber understood that Johnson had been committing crimes since the age of fourteen but did not consider this to be a life of crime. She stated that he "had antisocial features and continues to have them." Her testing showed that Johnson had no trauma and did not suffer from posttraumatic stress disorder. In fact, testing showed that Johnson was happy and not pessimistic. The results of the MMPI showed that Johnson was:
Somewhat immature and impulsive, a risk-taker who may do things others may not approve of just for the personal enjoyment of doing so. He is likely to be viewed as rebellious. He tends to be generally oriented toward pleasure seeking and self-gratification. He may occasionally show bad judgment and tends to be somewhat self-centered, pleasure-oriented, narcissistic, and manipulative. He is not particularly anxious and shows no neurotic or psychotic symptoms.
The MCMI-III and the MMPI-2 showed antisocial personality features, as did the diagnosis on her report. Dr. Haber acknowledged *498 that while there is no direct correlation between having an adjustment disorder and becoming a hired hit man, there is a correlation between having an antisocial personality and becoming a hired hit man.
Dr. Haber believed that if the jury had heard about the different stressors in Johnson's life, including his maladjustment to homosexuality, they might have been impacted on some level. Although Johnson did not disclose his homosexuality until he had been on death row for three years, Dr. Haber believed that Johnson might have spoken about this issue if the right person had asked him.
Dr. Haber conceded that she had never testified on behalf of the State in a death penalty case.

Testimony of the Defendant's Mother
The defense presented Wilhelmina Ferguson, Johnson's mother, as their second witness. She claimed that Badini did not prepare her to testify and that neither Badini nor anyone working on his behalf interviewed Johnson's family. She had no knowledge of Johnson ever suffering from any psychological problems. She assumed that Johnson was using drugs because he had stolen a television from a family friend. Badini told her not to testify about the possibility that Johnson was using drugs.
On cross-examination, Ferguson admitted that she never saw Johnson act as if he was on drugs and did not know whether Johnson actually was using drugs. She merely assumed that he was using drugs because he stole a television.

Testimony of the Defendant
The defense called Johnson as their third witness. Johnson testified that Arthur Huttoe[4] never tried to get a complete biography from him. Johnson claimed that he only spoke to Raymond Badini[5] twice. Johnson asserted that Badini did not discuss the penalty phase or attempt to get background information from him during the two visits. Johnson claimed that two investigators came to see him but they did not inquire about his background. He admitted that he spoke to a psychiatrist or psychologist, but claimed that the interview lasted only fifteen minutes. He stated that the doctor did not ask him about his background and merely asked questions related to his competency to stand trial. Johnson claimed that he was unaware that there would be a penalty phase to his first trial until the end of the trial.

Testimony of Defense Counsel
The State presented the testimony of Raymond Badini. Badini stated that before he represented Johnson, he had represented numerous defendants charged with first-degree murder who were facing the death penalty. Badini testified that he met with Johnson numerous times during his representation and recalled that their first discussion was at the time of his arraignment. Badini stated that he did meet with Johnson's family but did not go to their home. He discussed their testimony with them before he called them to testify.
On cross-examination, Badini stated that he had conducted five penalty phases. He was aware of the value of mental health evidence in penalty phase proceedings. He arranged for Dr. Lloyd Miller, a forensic psychologist, to evaluate Johnson for mental mitigation. Because of problems with funding from the county, he did this without having Dr. Miller officially appointed. *499 He specifically asked Dr. Miller to look for mitigation and not sanity or competence. Dr. Miller reported that he did not see anything that could be presented in mitigation. Badini did not recall the specifics of his conversations with Dr. Miller and did not recall what Dr. Miller had told him about the scope of his evaluation.
Badini testified that he spoke to Johnson's family on numerous occasions. During these pretrial discussions, they discussed Johnson's family background. Badini was sure that he discussed drug addiction during these discussions. He was aware of the death of Johnson's grandmother and his friend Ant, and Badini believed that the death of Ant was the trigger that resulted in Johnson's committing these crimes.

The Lower Court's Order
Written closing arguments were submitted after the evidentiary hearing. On January 17, 2003, the lower court issued its order denying Johnson's motion for post-conviction relief. The court found that all of the claims that it had summarily denied were facially insufficient, refuted by the record, or procedurally barred. As for the claim of ineffective assistance of counsel at the penalty phase, the court found that Johnson was evaluated at the time of trial for mental mitigation and that Johnson failed to prove that he was prejudiced by the failure to present at the penalty phase the results of a psychological evaluation. Johnson now appeals the circuit court's denial of relief. He also petitions this Court for a writ of habeas corpus.

I. INEFFECTIVE ASSISTANCE OF COUNSEL FOR FAILURE TO INVESTIGATE AND PRESENT MITIGATION EVIDENCE
Johnson argues that counsel was ineffective for failing to investigate and present mitigation evidence. Specifically, Johnson argues that counsel (1) failed to conduct a reasonable investigation into mitigating evidence by failing to obtain a psychiatric evaluation of Johnson; and (2) failed to present mitigating evidence during the penalty phase. In a lengthy analysis of Johnson's claim, the circuit court found that (1) Badini did have an evaluation performed by a competent doctor and cannot be deemed ineffective for failing to have Johnson evaluated; (2) Badini was not ineffective for failing to discover Johnson's sexual orientation, especially since there is no correlation between homosexuality and committing murder; (3) Badini presented mitigation evidence; and (4) Johnson failed to show that the presentation of further evidence would have resulted in a life sentence.

A. Applicable Law
As we most recently stated in State v. Duncan, 894 So.2d 817 (Fla.2004):
Following the United States Supreme Court's decision in Strickland [v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)], this Court held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:
A claim of ineffective assistance of counsel, to be considered meritorious, must include two general components. First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the proceeding that confidence in the outcome is undermined.

Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986). Ineffective assistance of counsel claims present a mixed question of law and fact and, therefore, are subject *500 to plenary review based upon the Strickland test. See id.; see also Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999). Under this standard, this Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.

There is a strong presumption that trial counsel's performance was effective. Strickland provides: "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," 466 U.S. at 689, 104 S.Ct. 2052, and further: "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 690, 104 S.Ct. 2052. The defendant alone carries the burden to overcome the presumption of effective assistance: "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. 2052. The United States Supreme Court explained:
[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

Id. at 690, 104 S.Ct. 2052; see also Asay v. State, 769 So.2d 974, 984 (Fla.2000) ("[T]he defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional standards and was not a matter of sound trial strategy."). Finally, "[j]udicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S.Ct. 2052.
Duncan, 894 So.2d at 823.

B. Failure to Conduct a Reasonable Investigation
Johnson argues that counsel failed to conduct a reasonable investigation into mitigating evidence by failing to have a psychiatric evaluation performed on Johnson. See Ragsdale v. State, 798 So.2d 713, 716 (Fla.2001) ("[A]n attorney has a strict duty to conduct a reasonable investigation of a defendant's background for possible mitigating evidence."). He argues that had the evaluation been performed, counsel could have presented mitigating evidence concerning his alleged adjustment disorder and alleged sexual disorder.
In finding that Johnson failed to establish that counsel's investigation was not reasonable, the circuit court noted that Johnson testified during the evidentiary hearing that he met with Dr. Miller prior to the penalty phase. From Johnson's testimony it appears that Dr. Miller conducted a competency examination. However, Badini testified that he asked Dr. Miller to perform a full forensic evaluation on Johnson. Badini did not recall receiving a written report but did recall Dr. Miller telling him there was "nothing there." Although testimony as to the extent of the evaluation differs, it is clear from the testimony of Johnson and Badini that Johnson was evaluated by Dr. Miller prior to the penalty phase.
*501 The trial court's findings of fact and ultimate conclusion that Johnson did not satisfy his burden of proof are supported by competent, substantial evidence. We give deference to these findings and hold that Johnson has failed to meet his burden to overcome the presumption of effective assistance of counsel.

C. Failure to Present Mitigating Evidence of Johnson's Sexual Disorder
Johnson alleges that counsel was ineffective for failing to present testimony concerning his alleged sexual disorder. Johnson argues that the mental health testimony offered by Dr. Haber presented an evidentiary basis to assert the statutory mitigating factor that he was under the influence of extreme duress or under the substantial domination of another person at the time of the crime. Further, Johnson argues that the psychological profile offered by Dr. Haber could have made Johnson's age more relevant and persuaded the court not to reject the age mitigating factor. The circuit court noted that the alleged sexual disorder was based on Johnson's homosexuality. However, it is undisputed that Johnson never revealed the fact that he was a homosexual until 1995, when he had been on death row for three years. Without more, Johnson has failed to meet his burden of showing that counsel was deficient for failing to discover his alleged sexual disorder.

D. Failure to Present Mitigating Evidence of Johnson's Adjustment Disorder
Johnson alleges that counsel was ineffective for failing to present testimony concerning his alleged adjustment disorder. Johnson argues that the mental health testimony offered by Dr. Haber presented an evidentiary basis to assert the statutory mitigating factor that he was under the influence of extreme duress or under the substantial domination of another person at the time of the crime. Further, Johnson argues that the psychological profile offered by Dr. Haber could have made Johnson's age more relevant and persuaded the court not to reject the age mitigating factor.
Dr. Haber testified at the evidentiary hearing that no serious mental health disorders were present. It is also clear from the evidentiary hearing that the introduction of testimony concerning his alleged adjustment disorder and sexual disorder would have opened the door to discussion of Johnson's antisocial features or traits. Counsel cannot be deemed ineffective for failing to present evidence that would open the door to damaging cross-examination and rebuttal evidence that would counter any value that might be gained from the evidence. See Breedlove v. State, 692 So.2d 874 (Fla.1997). Johnson has not shown "that there is a reasonable probability[6] that, but for counsel's unprofessional errors, the result of the [sentencing] proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. That is, even if we were to assume that counsel's performance was deficient, Johnson has not established a claim of ineffective assistance of counsel because he has not shown that there is a reasonable probability that, had Dr. Haber's testimony been presented, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. 2052. Johnson's claims are without merit.

*502 II. IMPROPER SUBSTITUTION OF COUNSEL
Johnson argues that the circuit court erred in summarily denying Johnson's claim that court-appointed counsel improperly delegated[7] his case to an unqualified attorney. The circuit court appointed Arthur Huttoe to represent Johnson. Over the course of the proceedings Johnson was represented by Badini and Carr.[8] Johnson argues that he did not consent to representation by Badini and Carr, and he contends that absent his consent to Badini and Carr's representation, his rights were violated.
As the circuit court noted, it is well established that an indigent defendant has an absolute right to counsel, but he does not have a right to have a particular attorney represent him. Koon v. State, 513 So.2d 1253 (Fla.1987) (citing Morris v. Slappy, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)). The decision of the Fourth District Court of Appeal in Woodberry v. State, 611 So.2d 1291 (Fla. 4th DCA 1992), is instructive in this case. The appellant in Woodberry was represented by court-appointed counsel at trial. A different attorney appeared for Woodberry at sentencing. Woodberry argued on appeal that this substitution of counsel rendered the sentencing hearing fundamentally unfair and constitutionally deficient. The court declined "to adopt a rule that such substitution constitutes reversible error per se. Each case must proceed on its own facts, and the burden is on appellant to demonstrate that his rights were prejudiced by the substitution." Woodberry, 611 So.2d at 1291. Notwithstanding Woodberry, Johnson argues that prejudice should be presumed in this case, or if not presumed, should be measured by comparing substituted counsel's level of experience and competence with those of appointed counsel. As authority for this suggestion, he cites to Holley v. State, 484 So.2d 634 (Fla. 1st DCA 1986). The court in Holley held that a presumption of prejudice was appropriate without inquiry into the actual conduct of the trial where unprepared counsel was substituted at the last minute before trial without the defendant's knowledge. The facts in Holley are distinguishable from the facts in this case. Counsel in Holley had very little involvement in the defendant's case before they were substituted as counsel on the eve of trial. In the present case, by Johnson's own admission, Badini and Carr represented him throughout most of the proceedings. As the Fourth District held in Woodberry, prejudice cannot be presumed from the mere substitution of counsel without a defendant's consent. See Eutzy v. State, 536 So.2d 1014, 1015 (Fla.1988) (to support a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced him). Johnson has failed to allege or demonstrate that he was prejudiced by the substitution of Badini and Carr as counsel in his case. Because Johnson did not sufficiently plead prejudice as a result of the substitution, the trial court did not err in summarily denying his claim.

*503 III. INEFFECTIVE ASSISTANCE OF COUNSEL DURING VOIR DIRE
Johnson alleges that the lower court erred in summarily denying his claim that counsel was ineffective during voir dire for failing to properly question the panel on death qualification. He argues that counsel failed to question the venire panel as to the effect mitigating circumstances might have on their willingness to apply the death penalty. He further argues that his counsel's failure to have conducted any meaningful voir dire on death qualification constituted a waiver of Johnson's right to due process and constituted a fundamental miscarriage of justice.
We begin by noting the importance of adequate voir dire on death qualification. Voir dire is an essential part of any first-degree murder trial in which the death penalty is sought. With that said, it is apparent from the record in this case that both the court and the State questioned the venire members in detail about their views both for and against the death penalty. The State and the court explained both the aggravating and mitigating factors and the weighing process during the jury selection process.
Both the trial court and the State questioned the prospective jurors about their views on the death penalty. The State repeatedly stated during voir dire that if the mitigating factors outweighed the aggravating factors a sentence of life had to be imposed. Additionally, the State repeatedly asked the jurors whether they could recommend life imprisonment if they were reasonably convinced that the mitigating factors outweighed the aggravating factors. Badini's co-counsel, Joy Carr, stated during voir dire, "I am just speaking to you briefly because the Judge in his questions and the prosecutor in his questions has really covered most of the area that we have questions about to try and find out if you are appropriate people to sit in judgment on this particular case." The circuit court noted in its order denying postconviction relief that Johnson failed to state what additional questions counsel should have asked during voir dire.
In Teffeteller v. Dugger, 734 So.2d 1009 (Fla.1999), the defendant alleged that counsel did not adequately question the prospective jurors about their pretrial knowledge of the case. In denying Teffeteller's claim, the Court noted that the voir dire record indicated that the judge questioned the prospective jurors about pretrial publicity and their knowledge of the case. Those who expressed even the slightest knowledge of the case were further questioned to determine whether they could disregard this information and render an impartial verdict based solely on the evidence at the resentencing proceeding. The prosecutor also questioned the prospective jurors about their exposure to news reporting. The Court held:
In light of this questioning of the prospective jurors, we cannot fault trial counsel for failing to repeat the questioning. Thus, Teffeteller has failed to prove deficient performance in this regard. Moreover, in light of the procedure followed by the court, even if counsel was remiss in not asking additional questions during voir dire, it resulted in no prejudice to Teffeteller and no relief is warranted on this basis.
Id. at 1020-21. The same is true in this case. The trial court and State thoroughly questioned the prospective jurors about their views of the death penalty.
To show prejudice, Johnson argues that Badini could possibly have learned more about the jurors' views and used his peremptory challenges in a different manner *504 to obtain a more defense-friendly jury.[9] Such speculation fails to rise to the level of ineffective assistance under Strickland. See Reaves v. State, 826 So.2d 932, 939 (Fla.2002) (holding that an allegation that there would have been a basis for a forcause challenge if counsel had "followed up" during voir dire with more specific questions was mere conjecture). Essentially, even if we were to assume counsel's performance was deficient, given the thorough questioning by the State and the court, Johnson has failed to show any prejudice. Therefore, the trial court did not err in summarily denying the claim.

IV. FAILURE TO REHABILITATE JUROR WILLIAMS
Johnson argues that the trial court erred in summarily denying his claim that counsel was ineffective for failing to rehabilitate juror Williams. During the State's questioning, Williams continually stated that he could not impose the death penalty. He was asked the following question:
Mr. Bagley [the State]: ... What I need, even though you may prefer not to recommend the death penalty, would you be able to do so?
Mr. Williams: No.
Mr. Bagley: You would not be?
Mr. Williams: No.
As shown above, Williams definitively stated that he would not be able to recommend the death penalty. While Johnson alleges that counsel was ineffective for failing to rehabilitate Williams, he does not state what questions counsel could have asked to rehabilitate Williams. It is doubtful that any attempt at rehabilitation would have been successful. Counsel's performance was not deficient and summary denial was proper. See Kimbrough v. State, 886 So.2d 965 (Fla.2004); Gaskin v. State, 737 So.2d 509, 516 (Fla.1999); see also Reaves v. State, 826 So.2d 932 (Fla. 2002) (affirming summary denial of ineffective assistance claims where no challenge for cause would have been successful for named jurors and where claims that follow-up questions would have revealed a basis for cause challenges constituted mere conjecture).

V. INEFFECTIVE ASSISTANCE OF COUNSEL REGARDING THE MOTION TO SUPPRESS
Johnson argues that counsel was ineffective for failing to adequately investigate Johnson's alleged illegal arrest and for failing to cross-examine Detective Borrego to show how deception was used to obtain Johnson's confession. Specifically, Johnson alleges that if counsel had interviewed Terrace Isom, David Faison, and Anita Miller, counsel would have determined that Johnson did not voluntarily accompany Officer Hull to the police station.
The trial court summarily denied the claim on the basis that Officer Hull had probable cause to arrest Johnson. Therefore, whether Johnson voluntarily went with officer Hull was not an issue that would have affected the outcome of the trial. The record shows that Jeffrey Briggs identified Johnson in a photo lineup at 10:40 a.m. on April 1, 1989. Johnson accompanied Officer Hull to the police station sometime after 6 p.m. on April 1, 1989. Thus, at the time Johnson accompanied Officer Hull to the police station, he had already been identified in a photo lineup and probable cause to arrest Johnson existed. See State v. Gavin, 594 So.2d 345 (Fla. 2d DCA 1992). The photo lineup was apparently conducted by Detective Borrego. Officer Hull picked up Johnson at the *505 request of Detective Borrego. Under the fellow officer rule, probable cause is imputed to Officer Hull. See Routly v. State, 440 So.2d 1257, 1261 (Fla.1983). Even if one assumes Johnson did not voluntarily accompany the officers to the police station, the claim is without merit because probable cause to arrest Johnson existed.
Johnson also argues that counsel was ineffective for failing to cross-examine Detective Borrego to show how deception was used to obtain Johnson's confession. Johnson alleges that he was deceived when he was told during his questioning that Rodney Newsome[10] was in the police station providing information. Johnson alleges that Newsome did not make a statement until after Johnson himself made a statement. Even if Johnson's allegations are taken as true, this Court and the United States Supreme Court have held that police officers are permitted to falsely inform suspects regarding the evidence they have against them. See Frazier v. Cupp, 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding that falsely informing a defendant that a codefendant had confessed did not result in the defendant's confession being involuntary); Escobar v. State, 699 So.2d 988, 994 (Fla.1997); Grant v. State, 171 So.2d 361, 363 n. 1 (Fla.1965). This claim is legally insufficient and summary denial was proper.

VI. DENIAL OF THE MOTION TO SUPPRESS
Johnson alleges that the police coerced him into waiving his Miranda[11] rights by administering an oath. The circuit court held that Johnson's allegations were vague and insufficient to state a claim. In addition, the court noted that this claim could have been raised on direct appeal and is procedurally barred. Francis v. Barton, 581 So.2d 583 (Fla.1991). We agree. Issues regarding whether a confession should have been suppressed as involuntary are issues that could have been raised on direct appeal. See Christopher v. State, 489 So.2d 22, 24 (Fla.1986). This claim is procedurally barred.

VII. FAILURE TO IMPEACH TREMAINE TIFT
Johnson alleges that counsel was ineffective for not cross-examining Tift as to why he was not prosecuted as an accessory after the fact to the Lawrence murder. Johnson alleges that Tift rented a hotel room for Johnson and his codefendants to hide out in after the Lawrence murder. He asserts that Tift should have been charged as an accessory after the fact for this reason. The State points out that the mere fact that Tift rented a hotel room for Johnson is not sufficient to have exposed Tift to liability as an accessory after the fact. Johnson's allegations were insufficient to show that Tift could have been impeached with the State's failure to prosecute him as an accessory after the fact. Furthermore, the record does not support the allegation that Tift was an accessory after the fact. Tift testified at the Lawrence murder trial that he was not aware of the murder until two to three weeks after the murder. Johnson's allegations are insufficient to show that Tift could have been impeached with the State's failure to prosecute him as an accessory after the fact.
Additionally, there is no reasonable probability that the result of the trial *506 would have been different had counsel attempted to impeach Tift. Attempting to show that Tift was an accessory after the fact in the Lawrence murder would necessarily have advised the jury that Johnson had committed another murder. Counsel cannot be deemed ineffective for refusing to open the door to damaging evidence. Breedlove v. State, 692 So.2d 874 (Fla. 1997). The circuit court did not err in summarily denying this claim.

VIII. FAILURE TO REQUEST A CONTINUANCE
Johnson argues that Badini was ineffective for failing to request a continuance prior to trial. As support for his claim, Johnson argues that Badini did not have Johnson evaluated by a mental health expert until immediately prior to trial and was therefore not prepared to go to trial. See Code v. Montgomery, 799 F.2d 1481 (11th Cir.1986). As discussed in issue I, the circuit court found after an evidentiary hearing that Badini was not ineffective for failing to present mental health mitigation. Because issue I is without merit, this claim is likewise without merit. In Code, counsel neither adequately interviewed nor subpoenaed any witnesses to appear at trial. The court held that counsel's performance in not interviewing the witnesses was deficient, as was counsel's failure to request a continuance. Code is not applicable in this case because Johnson has failed to establish that Badini's pretrial investigation was deficient.

IX. FAILURE TO OBJECT TO THE PENALTY PHASE JURY INSTRUCTIONS
Johnson argues that counsel was ineffective for failing to object to the CCP jury instruction which was found by this Court to be unconstitutionally vague in Jackson v. State, 648 So.2d 85 (Fla.1994). This Court addressed a similar claim in Walton v. State, 847 So.2d 438, 445 (Fla. 2003). In disposing of Walton's claim that his counsel was ineffective for failing to anticipate Jackson and the underlying United States Supreme Court decision in Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), the Court stated:
Because the Espinosa decision was delivered by the United States Supreme Court in 1992, and refinement of Florida's jury instructions by this Court began thereafter, trial and appellate counsel cannot be faulted for failing to assert claims that did not exist at the time they represented Walton. This Court has consistently held that trial and appellate counsel cannot be held ineffective for failing to anticipate changes in the law. See, e.g., Nelms v. State, 596 So.2d 441, 442 (Fla.1992); Stevens v. State, 552 So.2d 1082, 1085 (Fla.1989).
Walton, 847 So.2d at 445. This Court has never held the giving of the standard CCP jury instruction to be fundamental error. See Jackson, 648 So.2d at 90 (holding that claims that the instruction on the CCP aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal). The circuit court did not err in summarily denying the claim.

X. BRADY[12] CLAIM
Johnson argues that the State suppressed the identities of witnesses Anita Miller, Terrace Isom, and David Faison, who could have testified to the circumstances under which Johnson was taken into custody.

*507 A. Applicable Law

To establish a Brady violation, the defendant must show the following: (1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice. Rogers v. State, 782 So.2d 373, 378 (Fla.2001) (citing Strickler v. Greene, 527 U.S. 263, 280-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
Brady claims are mixed questions of law and fact. Rogers, 782 So.2d at 376-77. When reviewing Brady claims, this Court applies a mixed standard of review, "defer[ring] to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but review[ing] de novo the application of those facts to the law." Lightbourne v. State, 841 So.2d 431, 437-38 (Fla.2003) (citing Stephens v. State, 748 So.2d 1028, 1031-32 (Fla.1999)).

B. Analysis
Johnson's claim is facially insufficient. He alleges that had Miller, Isom, and Faison testified, it would have been revealed that Johnson did not voluntarily accompany the police to the police station. However, Johnson does not allege that the State actually possessed any material evidence, exculpatory or impeaching, from any of these witnesses. See State v. Knight, 866 So.2d 1195, 1201 n. 6 (Fla. 2003) (not Brady evidence where witnesses had not informed State of exculpatory information). There is no allegation the State had any statements from these witnesses. This allegation is insufficient to state a Brady claim.
Additionally, even if one assumes the allegation is facially sufficient, the record in this case shows that Johnson was equally aware of the identity of Miller, Isom, and Faison. The State cannot be said to have suppressed evidence that the defendant himself had knowledge of. Maharaj v. State, 778 So.2d 944, 954 (Fla. 2000) ("Although the `due diligence' requirement is absent from the Supreme Court's most recent formulation of the Brady test, ... a Brady claim cannot stand if a defendant knew of the evidence allegedly withheld ... simply because the evidence cannot then be found to have been withheld from the defendant."). The claim was properly summarily denied.
To the extent that the defendant impliedly alleges a violation of Florida Rule of Criminal Procedure 3.220, such a claim is procedurally barred. Claims that could have and should have been raised on direct appeal are procedurally barred. Griffin v. State, 866 So.2d 1, 18 (Fla.2003), cert. denied, 543 U.S. 413, 125 S.Ct. 413, 160 L.Ed.2d 328 (2004).

XI. VALIDITY OF JOHNSON'S FELONY-MURDER CONVICTION
The State proceeded at trial on the basis of premeditation and felony-murder. The felony-murder charge was based upon a burglary charge originating from Johnson's actions at the laundromat owned by Larkins. When Johnson sought entry to Larkins' laundromat, the front door was locked, but there were other customers still inside. Johnson came to the door and requested change from Larkins. Larkins retrieved her keys and unlocked the door. Johnson argues that because he was able to gain entry with Larkins' consent, albeit under false pretenses, he has an absolute defense to armed burglary and the felony-murder theory pursuant to Miller v. State, 733 So.2d 955 (Fla.1998). The circuit court held that Miller would not meet the test of retroactive application in Witt v. State, 387 *508 So.2d 922 (Fla.1980).[13] We agree. Miller does not apply retroactively.
In Witt, this Court held that a change in the law does not apply retroactively unless the change (a) emanates from this Court or the United States Supreme Court, (b) is constitutional in nature, and (c) constitutes a development of fundamental significance. Id. at 931. In Delgado v. State, 776 So.2d 233 (Fla.2000), this Court held that the opinion would not apply retroactively to convictions that have become final. We noted that Delgado did not meet the second or third prongs of the Witt test. Delgado, 776 So.2d at 241 n. 7. Additionally, Judge Sharp stated in her concurring specially opinion in Hodges v. State, 741 So.2d 1262 (Fla. 5th DCA 1999):
[I]n order to be retroactively applied, a change in the law must represent a "fundamental" change. Witt v. State, 387 So.2d 922 (Fla.1980). What constitutes a "fundamental" change in the law is a rather fluid concept, not easily pinned down. However, I consider Miller a "refinement" of the law, and, without direction from the Florida Supreme Court, it should not be applied retroactively.
Hodges, 741 So.2d at 1262 (Sharp, J., concurring specially). We hold that Miller, as with Delgado, does not satisfy the second and third prongs of the Witt test. Accordingly, the claim was properly denied summarily by the circuit court.
Even if the claim was not procedurally barred, Johnson would not be entitled to relief pursuant to Miller because it is clear in this case that he obtained entry to the laundromat under false pretenses. Consent obtained by trick or fraud is actually no consent at all and will not serve as a defense to burglary. See Schrack v. State, 793 So.2d 1102 (Fla. 4th DCA 2001) (affirming burglary conviction after Delgado where defendant gained entry by concocting a story about a surprise party); Alvarez v. State, 768 So.2d 1224, 1225 (Fla. 3d DCA 2000) (holding that defendant lacked consent to enter where he gained entry into the victim's house on the subterfuge that he wished to use the bathroom); Gordon v. State, 745 So.2d 1016 (Fla. 4th DCA 1999) (holding that defendant's conduct in feigning toothache to gain entry into the victim's home negated consent).

XII. THE NONSTATUTORY MITIGATING CIRCUMSTANCE JURY INSTRUCTION
Johnson argues that the nonstatutory mitigating circumstance jury instruction in his case was erroneous and that Badini's failure to object to the instruction constituted ineffective assistance of counsel.
Counsel did not object to the nonstatutory mitigation jury instruction at trial; therefore, Johnson's challenge as to the jury instruction is procedurally barred. Turning to the ineffective assistance of counsel claim, this Court has repeatedly affirmed the giving of the same catch-all nonstatutory mitigation jury instruction that was given in Johnson's case. Belcher v. State, 851 So.2d 678, 684-85 (Fla.), cert. denied, 540 U.S. 1054, 124 S.Ct. 816, 157 L.Ed.2d 706 (2003); Downs v. Moore, 801 So.2d 906, 913 (Fla.2001) (holding that the "catch-all" standard jury instruction on nonstatutory mitigation when coupled with counsel's right to argue mitigation is sufficient to advise the jury on nonstatutory mitigating circumstances). Counsel cannot *509 be deemed ineffective for failing to raise a nonmeritorious issue. Kokal v. Dugger, 718 So.2d 138, 143 (Fla.1998). The circuit court did not err in summarily denying this claim.

XIII. PENALTY PHASE JURY INSTRUCTIONS
Johnson argues that the penalty phase jury instructions given in his case violated the requirements of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and counsel was ineffective for failing to object to the instructions. Because no objection was raised at trial, the claim is procedurally barred. Griffin, 866 So.2d at 18. Even if it was not procedurally barred, the claim is without merit and Johnson is not entitled to relief. Counsel cannot be deemed ineffective for failing to raise a nonmeritorious issue. Kokal, 718 So.2d at 143. The circuit court did not err in summarily denying this claim.

XIV. THE CONSTITUTIONALITY OF FLORIDA'S DEATH PENALTY
Johnson argues that Florida's death penalty scheme violates Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). This Court has repeatedly rejected similar claims. See Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002). Furthermore, one of the aggravating circumstances found by the trial court in this case was Johnson's prior conviction of a violent felony,[14] "a factor which under Apprendi[15] and Ring need not be found by the jury." Jones v. State, 855 So.2d 611, 619 (Fla. 2003); see also Doorbal v. State, 837 So.2d 940, 963 (Fla.) (rejecting Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003). Accordingly, the circuit court did not err in summarily denying this claim.

XV. PETITION FOR HABEAS CORPUS
In his petition for habeas corpus, Johnson asserts a number of claims of ineffective assistance of appellate counsel. In considering the petition for habeas relief on the basis of ineffective assistance of appellate counsel, we must determine:
[W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000); Thompson v. State, 759 So.2d 650, 660 (Fla.2000). Moreover, "[t]he defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069; see also Knight v. State, 394 So.2d 997, 1001 (Fla. 1981).
*510 Each of Johnson's six claims of ineffective assistance of appellate counsel is addressed in turn below.

1. Failure to Allege Error Concerning Substitution of Counsel
Johnson argues that appellate counsel was ineffective for failing to argue on appeal that the apparent substitution of Badini and Carr as counsel in place of Huttoe was improper. Johnson did not object at trial to representation by Badini and Carr and the issue was not preserved for appeal. Appellate counsel cannot be deemed ineffective for failing to raise an issue that was not preserved at trial. Groover v. Singletary, 656 So.2d 424, 425 (Fla. 1995). Additionally, as discussed in Johnson's 3.850 claim, even if the claim was not procedurally barred, Johnson's claim is without merit. Johnson has failed to show any prejudice resulting from the substitution of Badini and Carr as counsel. Appellate counsel cannot be deemed ineffective for failing to raise an issue that is without merit. Kokal v. Dugger, 718 So.2d 138, 143 (Fla.1998).

2. Failure to Allege Error Concerning the Denial of the Motion to Suppress
At trial Johnson filed a motion to suppress his confession. He argued that his confession was not voluntary. The motion to suppress was denied by the trial court, and the denial was affirmed on direct appeal by this Court. Johnson now argues that his appellate counsel was ineffective for failing to raise on direct appeal the argument asserted above in his 3.850 motion: that the giving of an oath compels a defendant to confess. Johnson cites Bram v. United States, 168 U.S. 532, 544-50, 18 S.Ct. 183, 42 L.Ed. 568 (1897), for this proposition. This claim is without merit. Appellate counsel cannot be deemed ineffective for failing to raise an issue that is without merit. Kokal, 718 So.2d at 143.

3. Failure to Claim That the CCP Jury Instructions Were Erroneous
Johnson argues that despite the pendency of his direct appeal when Jackson v. State, 648 So.2d 85 (Fla.1994), was decided, no effort was made by appellate counsel to challenge the CCP instruction as being unconstitutional. As discussed above, this claim is without merit. Trial counsel did not object to this claim at trial and the claim was not preserved for direct appeal. Appellate counsel cannot be deemed ineffective for failing to raise an issue that was not preserved at trial. Groover, 656 So.2d at 425. Additionally, this Court has never held the giving of the standard CCP jury instruction to be fundamental error. See Jackson, 648 So.2d at 90 (claims that the instruction on the CCP aggravator is unconstitutionally vague are procedurally barred unless a specific objection is made at trial and pursued on appeal).

4. Failure to Claim That the Evidence Was Insufficient to Establish Burglary
This claim was presented by Johnson in his 3.850 motion and is merely recouched in his petition for habeas corpus. For the reasons we stated above in addressing Johnson's 3.850 motion, this claim is without merit. Appellate counsel cannot be deemed ineffective for failing to raise an issue that is without merit. Kokal, 718 So.2d at 143.

5. Failure to Claim Error Under Caldwell
This claim was raised in Johnson's 3.850 motion and is without merit for the reasons discussed above. Trial counsel did not object to the jury instructions. Appellate counsel cannot be deemed ineffective for failing to raise an issue that was not preserved at trial. Groover, 656 So.2d at 425. Additionally, this Court has repeatedly *511 held that Florida's standard jury instructions do not violate Caldwell. Appellate counsel cannot be deemed ineffective for failing to raise an issue that is without merit. Kokal, 718 So.2d at 143.

6. Failure to Argue that the Nonstatutory Mitigation Instruction Was Erroneous
As discussed in the denial of Johnson's 3.850 motion, this claim is without merit. Trial counsel did not object to the giving of the nonstatutory mitigation jury instruction and the claim was not preserved for direct appeal. Appellate counsel cannot be deemed ineffective for failing to raise an issue that was not preserved at trial. Groover, 656 So.2d at 425. Additionally, this Court has repeatedly affirmed the giving of the catch-all jury instruction.

CONCLUSION
For the reasons stated above, we affirm the lower court's denial of Johnson's rule 3.850 motion and deny Johnson's petition for a writ of habeas corpus.
It is so ordered.
PARIENTE, C.J., and WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
PARIENTE, C.J., specially concurs with an opinion.
ANSTEAD, J., specially concurs with an opinion.
LEWIS, J., concurs in result only.
PARIENTE, C.J., specially concurring.
Although I concur in the majority opinion in this case, I write separately to briefly discuss the prejudice prong of an ineffective assistance of counsel claim under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). From time to time, it is useful to remind ourselves and our trial judges of the precise contours of the test for prejudice under Strickland, so that we do not inadvertently apply a more stringent test simply because we have referred to it in a shorthand manner. Justice Anstead penned a previous reminder in Robinson v. State, 770 So.2d 1167, 1171 (Fla.2000) (Anstead, J., specially concurring), and I set out the different standards for claims of newly discovered evidence, ineffective assistance, and presentation of false testimony in Trepal v. State, 846 So.2d 405, 437 (Fla.2003) (Pariente, J., specially concurring). This case provides the opportunity for another refresher.
In Strickland, the United States Supreme Court held that to establish ineffective assistance, the defense must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. The Court went on to say that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Thus, for the defendant to prevail on an ineffective assistance claim, the alleged deficiency "must be shown to have so affected the fairness and reliability of the proceedings that confidence in the outcome is undermined." Peterka v. State, 890 So.2d 219, 228 (Fla.2004) (quoting Gore v. State, 846 So.2d 461, 467 (Fla.2003); see also Maxwell v. Wainwright, 490 So.2d 927, 932 (Fla.1986); (stating that to prevail on an ineffectiveness claim the defendant must demonstrate that counsel's deficiency "so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined")).
The explanation of what constitutes a reasonable probability under Strickland is important because otherwise, the test for prejudice in an ineffective assistance claim could be confused with the more stringent *512 test for prejudice arising from newly discovered evidence. Newly discovered evidence warrants a new trial only if the evidence would probably produce a different result. See Jones v. State, 709 So.2d 512, 521 (Fla.1998); Jones v. State, 591 So.2d 911, 915 (Fla.1991). That test is outcome-determinative. The United States Supreme Court clarified the difference between the prejudice standards for newly discovered evidence and ineffective assistance claims:
[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case....
Even when the specified attorney error results in the omission of certain evidence, the newly discovered evidence standard is not an apt source from which to draw a prejudice standard for ineffectiveness claims. The high standard for newly discovered evidence claims presupposes that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result is challenged. An ineffective assistance claim asserts the absence of one of the crucial assurances that the result of the proceeding is reliable, so finality concerns are somewhat weaker and the appropriate standard of prejudice should be somewhat lower. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.

Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052 (citations omitted) (emphasis supplied).
In this case, none of the alleged defects argued by Johnson undermine confidence in the outcome of the proceedings. Thus, applying the Strickland standard focusing on the reliability of the proceedings, I concur in the affirmance of the trial court's denial of Johnson's postconviction claims of ineffective assistance of counsel.
ANSTEAD, J., specially concurring.
While I continue to disagree with this Court's analysis of the Supreme Court's opinion in Ring v. Arizona, I recognize that a majority of the Court has rejected the application of Ring to collateral claims.
I also fully concur in the observations made by Chief Justice Pariente in her separate opinion reminding us of the critical importance of recognizing the distinction between a defendant's burden in demonstrating prejudice under a Strickland analysis (sufficient prejudice to undermine confidence in the outcome), compared to the much stricter standard for entitlement to a new trial based on newly discovered evidence (a probability of a different result).
Unfortunately, this Court has repeatedly failed to recognize the distinction or blurred the distinction in its opinions, and has thereby substantially increased the risk that trial courts are erroneously applying the extremely heavy newly discovered evidence standard to Strickland claims. Trial courts are doing so because they see this language repeatedly in our opinions. We must make every effort to carefully distinguish between these two standards, and to correctly set out the correct standard for these distinct claims. There are countless numbers of this Court's decisions, as well as an even larger number of trial court orders, that repeat this mistake. At this stage it is virtually impossible to know what effect these mistakes have had on the administration of justice in Florida in death penalty cases, as well as other criminal cases.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.
[2] Johnson asserted the following claims: (1) his Sixth Amendment right to counsel and his rights to due process and equal protection were violated when his court-appointed counsel improperly delegated representation to an unqualified attorney; (2) counsel was ineffective for effectively waiving voir dire on death-qualification; (3) counsel was ineffective for failing to attempt to rehabilitate juror Williams; (4) counsel was ineffective during the penalty phase and sentencing; (5) counsel was ineffective for conducting an inadequate investigation into the facts and circumstances surrounding his detention by police that led to his taped confession; (6) counsel was ineffective for failing to impeach the credibility of Tremaine Tift; (7) counsel was ineffective for failing to request a continuance to enable psychological evaluations to be performed; (8) counsel was ineffective for failing to object to the aggravating factor of cold, calculated, and premeditated (CCP) on the grounds of unconstitutional vagueness, and Johnson was denied due process and equal protection when the jury was given insufficient guidance to determine whether to apply the aggravator; (9) Johnson was deprived of his personal right to testify; (10) Johnson's confession was obtained in violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; (11) the State suppressed immunity granted to Tremaine Tift for being an accessory after the fact in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution; (12) the State suppressed the identities of witnesses who could have testified to the circumstances under which Johnson was taken into custody; (13) Johnson's conviction for felony-murder was invalid in light of Miller v. State, 733 So.2d 955 (Fla.1998); (14) Johnson has been denied his right to due process and equal protection because access to the files and records pertaining to his case in the possession of certain State agencies has been withheld in violation of chapter 119, Florida Statutes; (15) the sentencing jury was misled by comments, questions, and instructions that unconstitutionally and inaccurately diluted the jury's sense of responsibility towards sentencing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and trial counsel was ineffective for not properly objecting; (16) Johnson was prejudiced by the court's instructions concerning nonstatutory aggravating circumstances; (17) Florida's death penalty procedure is unconstitutional.
[3] Huff v. State, 622 So.2d 982 (Fla. 1993).
[4] Johnson's court-appointed attorney who referred the case to Badini.
[5] Badini, with co-counsel Joy Carr, actually represented Johnson throughout his trial.
[6] A reasonable probability is a probability sufficient to undermine confidence in the outcome. Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
[7] Effective May 24, 1997, section 925.036(3), Florida Statutes (2004), prohibits "[a]n attorney appointed in lieu of the public defender to represent an indigent defendant [from] reassign[ing] or subcontract[ing] the case to another attorney."
[8] No motion to substitute counsel or order granting such a motion is included in the record. It appears from the record that although Johnson was represented throughout his case by Badini and Carr, Huttoe remained counsel of record for the duration of the proceedings.
[9] Badini exhausted all ten of his peremptory challenges in this case.
[10] Rodney Newsome, one of four suspects charged in the Lawrence murder, was convicted of second-degree murder and sentenced to twenty-two years in prison.
[11] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[12] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[13] Additionally, Johnson did not raise the Miller defense at trial or on direct appeal. Claims not raised at trial are procedurally barred unless they present a question of fundamental error. See Mordenti v. State, 630 So.2d 1080 (Fla.1994) (absent fundamental error, claims not raised at trial are procedurally barred).
[14] Johnson was convicted of the attempted first-degree murder of Marshall King on August 8, 1991.
[15] Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).